IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EAGLE AVIATION TECHNOLOGIES, LLC,

Plaintiff,

v.

CARSON HELICOPTERS, INC.

Defendant.

CIVIL ACTION
NO. 15-5216

## Opinion

**Slomsky, J.**                                                            **October 24, 2016**

Before the Court is a Petition to Vacate [an] Arbitration Award.  Plaintiff, Eagle Aviation Technologies ("Eagle"), had a "Services Contract Agreement" with Defendant, Carson Helicopters, Inc. ("Carson").  The parties had a dispute over implementation of the contract and went to arbitration to settle it.  The Arbitrator ruled in favor of Defendant.  Plaintiff then filed the instant suit against Defendant.  Plaintiff claims that the Arbitrator exceeded his power under the Agreement's arbitration clause by addressing issues not within the scope of the contract.  For reasons that follow, the Court will deny the Petition to Vacate [the] Arbitration Award and confirm the Arbitrator's award.

## I.      Background

### A.  The Blackhawk H-60 Main Rotor Blade Project

Eagle is a research and development company located in Hampton, Virginia.  (Doc. No. 14, at 1.)  Since 2002, Eagle has conducted research and development for aeronautics companies.  (Doc. No. 15, at 4.)  Carson is an aviation company located in Perkasie, Pennsylvania.  (Id. at 2.)  Carson began its business with a focus on "constructing Bell helicopters from spare parts and

selling them." (Id. at 2–3.)  Carson subsequently expanded its business by selling "composite tail rotor blades" and refurbishing Sikorsky S-61 helicopters for commercial use.[1] (Id. at 3.)

Approximately eight years ago, Carson developed a plan to design a "composite main rotor blade to replace the existing metal blade on the Army's H-60 Blackhawk helicopter . . . ." (Id. at 5.)  Carson believed it could create a new secondary market for "aging" Blackhawk helicopters through its redesigned rotor blades.  (Id. at 5–6.)  On or about May 1, 2011, Carson contracted with Eagle to complete the design and manufacture of Carson's H-60 composite rotor blade.  (Id. at 6.)  Eagle also did work on the tail rotor blades for Carson's Sikorsky S-61 helicopters.

### B.  The Agreement[2]

Under the Service Contract Agreement's "Statement of Work[,]" Eagle was to provide the "[d]esign, analysis, test and manufacturing of an Advanced Composite Blackhawk Main Rotor Blade." (Doc. No. 15, at 8.)  The "Statement of Work" section of the agreement provided that a "detailed Work Breakdown Structure (WBS) and Project Plan will be developed at as [sic] the program progresses further."  (Id.)  Article 2.A of the Agreement states that the Statement of Work "may be amended, revised, or extended by mutual agreement of the parties."[3]  (Id.)

---

[1]  Bell and Sikorsky helicopters are utilized by the United States military.

[2] During the arbitration, Eagle raised the issue that a valid contract did not exist between Eagle and Carson.  This issue, however, has not been argued in this Court by Eagle.  Accordingly, the facts pertaining to the formation of the contract have been omitted from this Opinion.  For a discussion of the contract formation and the Arbitrator's finding see (Doc. No. 15, Ex. 2 at 1– 3).

[3] Article 2.A provides in its entirety:

> Company agrees to sell and Carson agrees to buy the Services, and all the rights to use the Data and Documentation for the prices by Line Item as set forth above. Company shall render these services as described in Exhibit A and shall produce

Moreover, Article 9.A gave Carson the right to "make changes within the general scope of . . . [the] agreement" so long as Carson provided Eagle written notice of the change.[4]  (Id.)  The work contracted for was to be completed by Eagle on a "time and material" basis.  (Id.)  General rates and calculations of the costs to be paid by Carson were noted.  They were also to be submitted to Carson.  (Id.)  Article 11.B of the Agreement committed Carson and Eagle to binding arbitration in the event of a dispute, with an agreement that the Arbitrator's decision would be "final."[5]  (Id.)  The Agreement between the parties did not refer to any work that Eagle performed on Carson's Sikorsky S-61 project.

---

or deliver to Carson the items or deliverables set forth therein (the "Services"). Company shall devote such time and effort necessary for the successful performance of Services being procured under this Agreement.  Exhibit A may be amended, revised, or extended from time to time by mutual agreement of the Parties.

[4] Article 9.A provides in its entirety:

Carson may, by written notice to Company at any time before completion of this Agreement, make changes within the general scope of this Agreement, including changes to (a) drawings, designs, or specifications; (b) quantity; (c) delivery; (d) method of shipment or routing; or (e) the amount of Carson furnished property.  If any such change causes a material charge under this Agreement, then Carson shall make any equitable adjustments to the extent necessary.

[5] Article 11.B provides in its entirety:

In the event of any dispute, hereunder, Carson and Company agree to negotiate in good faith to reach a mutually agreeable settlement within a reasonable amount of time.  If such negotiation is unsuccessful, Carson and Company shall enter into binding arbitration under the then-applicable Commercial Arbitration Rules of the American Arbitration Association (AAA), before a single arbitrator.  The arbitration shall take place in a mutually agreeable location. It is agreed by both parties that the arbitrator's decision is final, and that no party may take any action, Judicial or administrative, to overturn the decision of the arbitrator.  The judgment rendered by the arbitrator may be entered in any court having jurisdiction thereof. Pending any decision, appeal or judgment referred to in this provision or the settlement of any dispute arising under this agreement, Company shall proceed diligently with the performance of this Agreement.

### C.  The Demand for Arbitration

Disputes arose between the two parties over whether Eagle was performing under the contract.  Carson believed Eagle was overbilling for work not performed, mishandling recruitment efforts, and not making a good faith effort to complete its research.  (Id.)  On October 14, 2013, Carson sent Eagle a letter stating that it intended to commence litigation against Eagle.  (Doc. No. 15, at Ex. 3.)  Eagle did not respond to Carson's letter.  (Id. at 16.) Three months later, Carson's attorney notified Eagle of its claims and asked whether Eagle was prepared to "negotiate in good faith to reach a mutually agreeable settlement."  (Id. at Ex. 4.) Again, Eagle did not respond to this letter.  (Id. at 16.)

On February 11, 2014, Carson filed its Demand for Arbitration with the American Arbitration Association, raising breach of contract and tort claims.  (Id. at Ex. 5.)  Carson alleged that Eagle "fraudulently billed or overbilled Carson for work allegedly performed in connection with the Agreement."   (Id.)  The Demand included fourteen examples of Eagle's "fraudulent billing and overbilling" practices.  (Id.)  Carson's Demand for Arbitration also included issues regarding Eagle's work on the Sikorsky S-61 Transportation Reach Board ("TRB") project.  On March 10, 2014, Eagle filed an Answer to Carson's Demand for Arbitration.  (Id. at Ex. 6.)

On February 4, 2015, Eagle filed a Motion to Dismiss the Demand for Arbitration, requesting the Arbitrator dismiss Carson's Demand because Carson failed to prove there was a contract between the parties, and that the "gist of the action doctrine" barred Carson's tort claims.  (Id. at Ex. 8.)  Following oral argument, the Arbitrator granted Eagle's Motion to Dismiss in part and denied it in part.  (Id. at Ex. 11.)  The Arbitrator found that the "gist of the action doctrine" barred Carson's tort claims, but that a valid contract existed between Eagle and Carson.  (Id.)  Therefore, Carson's contract claims proceeded to the arbitration hearing.

4

### D.  The Arbitration Hearing

On June 16, 2015, the arbitration hearing began.  (Doc. No. 15, at 19.)  Over the course of four days, the Arbitrator heard testimony from twelve witnesses, including four experts, and received over 120 pieces of evidence.[6]  (Id.)  On August 19, 2015, the Arbitrator issued a twenty-three page award.  (Doc. No. 15, Ex. 2 at 1.)  The Arbitrator found in favor of Carson and awarded it the sum of $510,064 and costs of $5,625.  (Id. at 23.)

Basing his decision on Pennsylvania contract law, the Arbitrator found that a valid contract existed between Carson and Eagle.  (Id. at 1–3.)  Furthermore, the Arbitrator concluded that both parties mutually agreed to expand the scope of work under the Agreement to include the work on the "tail rotor blade project" on the Sikorsky S-61 helicopters, that Eagle engaged in the practice of "overbilling" in connection with Carson projects, and that Eagle had breached the terms of the Agreement.  (Id. at 5–8.)  The Arbitrator also rejected Eagle's counterclaims because they were raised for the first time in its Post-Hearing Brief.  (Id. at 22.)

Following the decision, Eagle filed the instant petition to vacate the Arbitrator's award asserting that the Arbitrator exceeded the scope of his power under the Agreement's arbitration clause by addressing the testing and production of the composite tail rotor blades for the Sikorsky S-61 helicopter; the purchase of an autoclave;[7] the payment of recruiter fees, and adjustment of costs paid.

## II.    Standard of Review

When reviewing an arbitration award, there is a strong presumption that the award is enforceable.  See Moses H. Cone Memorial Hosp. v. Mercury Const. Corp, 460 U.S. 1, 24–25

---

[6] The arbitration proceeding was not transcribed.

[7] "An autoclave is a device that provides heat and pressure to produce a high-quality, layered laminate of composite material."  (Doc. No. 15, Ex. 2 at 6 n.5).

(1983).  The Federal Arbitration Act (FAA) allows for very limited judicial review to confirm, vacate, or modify arbitration awards.  <u>Hall St. Assocs., LLC, v. Mattel, Inc.</u>, 552 U.S. 576, 578 (2008).  An award may only be vacated upon one of four enumerated grounds in the Federal Arbitration Act:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(4) (2012).  These grounds may not be supplemented by contractual provisions. <u>Hall St. Assocs., LLC</u>, 552 U.S. at 584.  Accordingly, when parties agree to resolve disputes through arbitration, without the court's intervention, "the courts will enforce the bargains implicit in such agreements by enforcing arbitration awards absent a reason to doubt the authority or integrity of the arbitral forum."  <u>Id.</u> at 219.

**III.    Analysis**

Plaintiff's asserted basis for vacating the arbitration award is Section 10(a)(4) of the Federal Arbitration Act.  (Doc. No. 14, at 10.)  Section 10(a)(4) permits a district court to vacate an arbitration award when the arbitrator exceeds its power.  9 U.S.C. § 10(a)(4).  Arbitration is a matter of consent, and parties are free to structure their arbitration agreements as they see fit. <u>Volt Info. Scis. Inc. v. Bd. of Tr. of Leland Stanford Junior Univ.</u>, 489 U.S. 468, 479 (1989). Parties may contractually restrict the issues they will: arbitrate, who they arbitrate with, and the

arbitration itself.  See Puleo v. Chase Bank USA, N.A., 605 F.3d 172, 181 (3d Cir. 2010) (en banc).  Accordingly, parties may agree to place limits and restrictions upon the Arbitrator's powers.  Id.

"An arbitrator oversteps these limits, and subjects his award to judicial vacatur under Section 10(a)(4), when he decides an issue not submitted to him, grants relief in a form that cannot be rationally derived from the parties' agreement and submissions, or issues an award that is so completely irrational that it lacks support altogether."  Sutter v. Oxford Health Plans LLC, 675 F.3d 215, 219 (3d Cir. 2012), aff'd, 133 S.Ct. 2064 (2013).  In essence, the Arbitrator's goal is to "interpret and enforce a contract."  Id. at 220.  So long as an Arbitrator makes a good faith effort, serious errors of law or fact will not subject his or her award to vacatur.  See Brentwood Med. Assocs. v. United Mine Workers of Am., 396 F.3d 237, 243 (3d Cir. 2005).  Only when an Arbitrator "strays from interpretation and application of the Agreement and effectively 'dispenses his own brand of industrial justice,'" does the Arbitrator's award become unenforceable.  Stolt-Neilsen v. AnimalFeeds Int'l Corp., 559 U.S. 662.

## A.  The Arbitrator's Award

Plaintiff asserts that the Arbitrator exceeded its authority by basing "its award on matters over which it lacked jurisdiction."  (Doc. No. 14, at 1.)  Eagle contends that the Arbitrator incorrectly interpreted the contract to encompass (a) Eagle's work on the testing of composite tail rotor blades (TRB) of the Sikorsky S-61 helicopter; (b) the purchase of an autoclave; and (c) the payment of recruiter's fees.  (Id. at 9.)  Eagle further argues that the Arbitrator improperly adjusted the amount paid for work performed, which was outside the scope of the arbitration.  (Id. at 10.)  Eagle contends that the Arbitrator's improper interpretation caused him to grant Carson an excessive award.  (Id.)  To the contrary, Carson argues that the both parties "amended,

revised . . . [and] extended their contract" to encompass the above mentioned work. (Doc. No. 15, at 1.)

So long as the Arbitrator makes a "good faith attempt" and interpretation based on principles of contract law, the Arbitrator does not exceed the scope of its power. <u>Oxford Health Plans LLC, v. Sutter</u>, 133 S.Ct. 2064, 2069 (2013). In <u>Oxford Health Plans LLC, v. Sutter</u>, the United States Supreme Court considered whether an Arbitrator exceeded his power in determining that the parties' contract authorized class arbitration. <u>Id.</u> at 2066. After a contractual dispute arose, the plaintiff and defendant proceeded to arbitration. <u>Id.</u> at 2067. During the arbitration proceeding the parties asked the Arbitrator whether the arbitration provision allowed for class arbitration. <u>Id.</u> Looking to the plain language of the arbitration clause, the Arbitrator determined that the parties' omission of a specific clause denying class arbitration was evidence of the parties' intent to allow for class arbitration. <u>Id.</u> Since the contract contained no clause that prohibited class arbitration, it was therefore allowed. The defendant sought to vacate the award based on the Arbitrator exceeding the scope of his powers. The district court affirmed the award finding that the Arbitrator relied on the plain meaning of the text to determine that the parties' contract authorized class arbitration. <u>Id.</u> On appeal, the Third Circuit affirmed the district court's ruling. <u>Id.</u> The Supreme Court also affirmed, noting that the Arbitrator did not exceed the scope of his power by "creating his own public policy[,]" but through implementing and relying on contractual interpretation. <u>Id.</u> at 2070–2071.

Similarly here, the Arbitrator first looked to the plain language of the Agreement to determine the scope of the of the Agreement's provisions. The Arbitrator began by noting the scope of the work to be performed. (Doc. No. 15, Ex. 2 at 3–4.) He noted that the Statement of Work stated that Eagle was to provide the "design, analysis, test, and manufacturing of [an]

8

Advanced Composite Blackhawk Main Rotor Blade." (<u>Id.</u> at 3.)  The Statement of Work further noted that a "detailed work Breakdown Structure and Project Plan will be developed at [sic] as the program progresses further." (<u>Id.</u> at 4.)  Further, the Arbitrator noted that Article 2.A of the Agreement expressly states that the Statement of Work "may be amended, revised, or extended by mutual agreement" and that this provision did not require the mutual agreement to be in writing.  (<u>Id.</u>)

Moreover, the Arbitrator noted that Article 9.A permitted Carson to make changes to the scope of the general agreement by providing "written notice" to Eagle.[8]  (<u>Id.</u>)  Article 9.A "does not require Eagle to expressly agree to the changes Carson makes nor does it require Eagle to agree to the changes in writing."  (<u>Id.</u>)  The Arbitrator continued to note that Article 13.D of the revised Agreement gave Carson's contractual representative the "authority to make changes in or amendments to this Agreement."[9]  (<u>Id.</u>)  The Arbitrator noted that changes "must be in writing."  (<u>Id.</u>)  Similar to Article 9.A, the Arbitrator further noted that Article 13.D requires only Carson to make changes to the contract in writing.  (<u>Id.</u>)  Article 13.D does not require Eagle to expressly agree to the changes nor does it require Eagle to agree to the changes in writing.  (<u>Id.</u>)

---

[8]  On June 1, 2011, Mia C. Copland, Vice President of Contracts and Administration at Eagle signed the initial agreement and invited Carson to make subsequent changes to the document. (Doc. No. 3-1 at 1).  On June 3, 2011 Eagle sent Carson the initial Services Contract Agreement, signed by Mia Copeland.  (<u>Id.</u>)  The agreement was effective as of "1 May 2011." (<u>Id.</u>)  Carson then revised the initial agreement on June 20, 2011.  (<u>Id.</u>)  On July 7, 2011, Jeffrey R. Hill, Vice President of Carson signed the revised agreement, as amended by Carson. (<u>Id.</u>)  On July 8, 2011, Carson sent a revised services contract to Mia C. Copeland, Vice President of Contracts and Administration of Eagle.  (<u>Id.</u>)  Copeland did not read the new contract and instead placed the revised agreement in a file.  (<u>Id.</u>)  The Arbitrator found a valid revised contract existed based between the parties.  The Arbitrator found that the Services Contract Agreement was supported by the mutual assent of the parties.  (<u>Id.</u>)  The Arbitrator found that three separate legal doctrines supported "Carson's position that a valid contract existed between the parties: mutual assent or a 'meeting of the minds,' acceptance via course of conduct, and ratification." (Doc. No. 3-1 at 1-2).

[9]  Article 13.D is titled "Contract Direction."

Lastly, the Arbitrator looked to Article 14 which states, "[s]ubject to Carson's rights hereof, this Agreement may be amended or modified, and any provision hereof may be waived, only by written instrument executed by both Parties."  (Id.)  The Arbitrator determined that the introductory phrase, "subject to Carson's rights hereof" limited the scope of Article 14 to rights that are not already defined in the Agreement, such as Carson's right under Article 9.A and 13.D to make changes in a specific manner.  (Id.)  Viewing Articles 2.A, 9.A, 13.D, and 14 together, and interpreting each one according to its plain meaning, the Arbitrator determined that his interpretation of the contract "best harmonizes the terms of the parties' contract and reads all of the provisions in context."  (Id.)

The Arbitrator applied the above interpretation of the Agreement's provisions to determine if the parties' contract included the testing and production of the composite TRB for the Sikorsky S-61 helicopter; the purchase of an autoclave; the payment of recruiter fees; and adjustment of costs paid.  (Id. at 5–9.)

1. **The Sikorsky S-61 Tail Rotor Blades (TRB)**

The Arbitrator did not exceed the scope of his power in determining that the TRB project for the Sikorsky S-61 helicopter was part of the Agreement.  Looking to the plain language of the Agreement, the Arbitrator found that the parties intended the TRB project to be within scope of the Agreement.  (Id. at 6.)  As noted above, the Arbitrator found that Article 2.A of the contract allows the parties to "amend, revise, or extend the SOW . . . upon a mutual agreement (written or oral) to include the TRB."  (Id. at 5.)  The Arbitrator then looked to the parties actions to determine if the parties' intended to include the TRB project in the contract.  The President of Carson believed that the TRB work would be performed under the original agreement.  Id. Eagle's President confirmed this belief by testifying that she believed Eagle had a single "time

and material agreement" for two separate "efforts."  (Id.)  Furthermore, Eagle did not forward a new contract to Carson for the TRB.  (Id.)  Instead, Eagle billed for and Carson paid the same labor rates for the TRB as the original agreements specified.  (Id.)  Thus, the parties "Contract Close Out" invoice referred to a single contract.  (Id.)  Based on this analysis, the Arbitrator concluded that the TRB work was intended by the parties' to be part of the Agreement.

As the court held in Oxford Health Plans, LLC, so long as the Arbitrator makes a "good faith attempt" at interpreting the parties' contract or conduct, the award will not be disturbed. 133 S.Ct. at 2069.  In that case, the Court confirmed the arbitration award, holding that the Arbitrator did not exceed the scope of his power in interpreting the contract clause by interpreting the contract provision's plain meaning.  Id.  Similarly here, the Arbitrator based his award on the plain meaning of the language and parties' conduct.  (Doc. No. 15, Ex. 2 at 5–6.) Accordingly, the Arbitrator did not exceed the scope of his power in addressing issues regarding the TRB project.

### 2.  Autoclave

The Arbitrator did not exceed the scope of his power in determining that the purchase of an autoclave was intended as a part of the parties' agreement.  Again, the Arbitrator looked to the language of agreement and parties' actions to determine whether the purchase of an autoclave was within the Service Contract Agreement.  (Doc. No. 15, Ex. 2 at 6.)  The Arbitrator found that the purchase of an autoclave was part of the parties' original agreement to "design, analyze, test, and manufacture the MRB [Main Rotor Blade]."  (Id.)  First, Article 2.C expressly authorized Eagle "to acquire property, equipment, or materials . . . as a direct cost to this agreement to fulfill its performance requirements" upon written approval by Carson.  (Id.)  Second, the Arbitrator found that both parties mutually agreed that an autoclave twenty-eight feet in length was

necessary to complete the Main Rotor Blade project.  (Id.)  Finally, the Arbitrator determined that no separate agreement existed between the parties for the purchase of an autoclave; Eagle billed Carson for the autoclave under the project number for the Main Rotor Blade; and Carson signed a form authorizing Eagle to buy a twenty-eight foot autoclave for the Main Rotor Blade. (Id. at 7.)  In addition, Article 3.B of the parties' revised agreement specifically encompassed the purchase of an autoclave and that Eagle would purchase one with Carson's funds for the manufacture of the Main Rotor Blade.  (Id.)  Basing his analysis on the plain meaning of the contractual clauses and the parties' conduct, the Arbitrator concluded that the autoclave was a part of the original contract.  (Id.)

Again, the Arbitrator's actions are in accord with Oxford Health Plans, LLC.  Just like the Arbitrator in Oxford Health Plans, LLC looked to the plain language of the agreement to discern the intent of the parties, the Arbitrator in this matter looked to the plain meaning of the contract's language.  133 S. Ct. at 2070.  Additionally, the Arbitrator here looked to actions of both parties to give meaning to the Agreement's express terms.  (Doc. No. 15, Ex. 2 at 6–7.) Thus, the Arbitrator did not exceed his power in deciding issues regarding the autoclave.

### 3.  Recruiter Fees

The Arbitrator also did not exceed the scope of his power in determining that the payment of recruiter's fees was within the scope of the Agreement.  The Arbitrator started his analysis by noting that Eagle sent Carson a letter requesting authorization to expedite the hiring process and discussing the cost to recruit staff.  (Doc. No. 15, Ex. 2 at 7.)  The Arbitrator interpreted the Carson letter as a written amendment to the Statement of Work, and through Carson's actions, it authorized the written amendment pursuant to Article 13.D of the Agreement.  (Id. at 8.)  Eagle subsequently billed Carson, Carson paid the projected placement

fees, and the new engineers were hired.  (Id.)  Basing his analysis on principles of contractual interpretation and the parties' actions, the Arbitrator appropriately concluded that the payment of recruiter's fees was within the scope of the Agreement

In Brentwood Med. Assocs. v. United Mine Workers of Am., the Third Circuit upheld an arbitration award where the Arbitrator relied on language not found in the agreement as the basis of the award.  396 F.3d 231, 241–42 (3d Cir. 2005).  The Third Circuit upheld the award finding that the Arbitrator based his interpretation on several provisions of the agreement and supported those interpretations by giving effect to the language in the agreement.  Id. at 242.  The Arbitrator here also interpreted the contract to include recruitment fees through specific provisions of the Agreement and thereby implemented the parties' actions.  (Doc. No. 15, Ex. 2 at 7–8.)  Accordingly, the Arbitrator did not exceed the scope of his power in resolving disputes regarding the payment of recruiter's fees.

### 4.  Adjustment of Amounts Paid

The Arbitrator did not exceed the scope of his power in reaching issues regarding the adjustment of amounts paid.  The Arbitrator looked to Article 6.D of the Agreement, which provided that "each payment previously made shall be subject to adjustment as a result of such audit."  (Id. at 9.)  He then looked to current dispute noting that Carson sought an adjustment for overbilling and that Eagle refused such an adjustment.  (Id.)  The Arbitrator further took into account Article 9.A which states that if material changes are made to the Agreement, Carson can seek equitable adjustments to the extent necessary.  Based on this analysis, the Arbitrator determined that Article 9.C applied, which states that "failure to agree to an adjustment shall constitute a dispute under the Disputes clause of the Agreement."  (Id. at 9 n.15.)  According to the Disputes clause, under Article 11.B, any dispute under the parties' agreement is to be

resolved at arbitration.  (Id.)  Thus, applying the plain language of the Agreement, the Arbitrator concluded that resolving the dispute over the adjustment was within the scope of the Agreement.

As stated above, when an Arbitrator uses the plain language of the text and gives meaning to all the language in the agreement, the Arbitrator does not abuse his power.  Oxford Health Plans, LLC,133 S. Ct. at 2070; Brentwood Med. Assocs., 396 F.3d at 241–42.  Here, the Arbitrator used the plain language of the Agreement, the actions of the parties, and gave consistent meaning to multiple provisions.  (Doc. No. 15, Ex. 2 at 9.)  Therefore, the Arbitrator did not exceed the scope of his power in conducting adjustments of amounts paid.

In addition, Eagle argues that the Arbitrator exceeded his authority by awarding adjustments on the basis of "fraud claims that the arbitrator previously and properly dismissed." (Doc. No. 14, at 10.)  Eagle does not specify which adjustments were on the basis of fraud claims, but a review of the Arbitrator's award shows that the adjustments were based on breach of contract claims.  (Doc. No. 15, Ex. 2 at 16–22.)  Specifically, examining the adjustment regarding Carson's payment for time charged by Eagle's co-owner principals, the Arbitrator determined that Carson was entitled to an adjustment of payments made because Eagle breached an express provision of the Agreement.  (Id. at 18.)  Article 6.D required Eagle to retain billing records for at least three years, and Eagle failed to retain any billing records for the three co-owners.  (Id. at 18 n.33.)  Eagle cannot maintain that the Arbitrator exceeded his power in settling issues on the basis of fraud when the record shows that the Arbitrator based his decision on the breach of an express provision within the contract.

Accordingly, the Arbitrator did not exceed the scope of his power in addressing issues regarding the adjustment of amounts paid.

**IV.      Conclusion**

      As set forth above, the Arbitrator based his award on principles of contract interpretation and made a good faith effort to determine the scope of the contract.   Accordingly, under the Federal Arbitration Act, Plaintiff's Petition to Vacate [the] Arbitration Award (Doc. No. 1) will be denied, and the Award of the Arbitrator will be confirmed.

      An appropriate Order follows.